**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                     Case No. 3:19-cr-207-MMH-MCR

MARIO CORREA JACKSON

_____

**O R D E R**

       **THIS CAUSE** is before the Court on Defendant Mario Correa Jackson's ore tenus motions for judgment of acquittal made during the three-day jury trial in this case, see Clerk's Minutes (Doc. 169); Clerk's Minutes (Doc. 170), and his written Motion for Judgment of Acquittal (Doc. 182; Motion), filed on June 16, 2023. At trial, Jackson moved for a judgment of acquittal at the close of the Government's case-in-chief on May 12, 2023, and again at the close of all the evidence on May 15, 2023. See Jury Trial (Volume 2 of 4) (Doc. 179; Tr. Vol. 2) at 260; Jury Trial (Volume 3 of 4) (Doc. 180; Tr. Vol. 3) at 103–04. Jackson based both motions on the alleged insufficiency of the evidence to prove guilt beyond a reasonable doubt. See Tr. Vol. 2, at 260; Tr. Vol. 3, at 103–04. On both occasions, Jackson asked the Court to reserve ruling until the Court received post-trial written briefing. See Tr. Vol. 2, at 260; Tr. Vol. 3, at 103–04. Without objection by the Government, the Court reserved ruling on both motions. See Tr. Vol. 2, at 260; Tr. Vol. 3, at 103–04. On May 16, 2023, the jury

returned a verdict finding Jackson guilty of Counts Four and Five of the Indictment (Doc. 1; Indictment).  See Verdict (Doc. 176; Verdict).  Specifically, the jury found Jackson guilty of soliciting and receiving a health care kickback on February 19, 2015, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 2 (Count Four) and offering and paying a health care kickback on February 2, 2015, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2 (Count Five).  See Verdict at 1–2; see also Indictment at 9–12.  The jury did not reach a verdict as to Count One, which charged Jackson with conspiracy to offer and pay, and to solicit and receive, health care kickbacks in violation of 18 U.S.C. § 371.[1]  See Verdict at 1; see also Indictment at 1–9.  In his post-trial Motion, Jackson renews his request that the Court enter a judgment of acquittal as to all counts against him pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Rule(s)) "based on insufficiency of the evidence."  Motion at 1.[2]  Jackson argues that the Government did not introduce sufficient evidence to prove that he "acted willfully with respect to any of the charged offenses."  Id. at 2.  The Government filed a response in opposition to the Motion on July 6,

---

[1] Counts Two and Three of the Indictment were directed at Jackson's co-defendants and thus not at issue in his trial.

[2] Following the jury's verdict, Jackson asked the Court to wait to adjudicate him guilty of Counts Four and Five until after receiving post-trial briefing on the motions for judgment of acquittal.  See Jury Trial (Volume 4 of 4) (Doc. 181) at 21.  Without objection by the Government, the Court did not adjudicate Jackson guilty or set a sentencing date.  See id. at 21–23.

2023.  See United States' Response in Opposition to Defendant's Motion for Judgment of Acquittal (Doc. 183).  Accordingly, this matter is ripe for review.

## I. Legal Standard

Rule 29 provides the Court with authority, where appropriate, to enter a judgment of acquittal before submission of the case to the jury or following a guilty verdict or the discharge of the jury.  See Rule 29(a), (c)(2).  A motion for judgment of acquittal under Rule 29 "is a direct challenge to the sufficiency of the evidence presented against the defendant." United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir. 1994); see also United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999) ("In considering a motion for the entry of judgment of acquittal under [Rule 29(c)], a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction.").  In ruling on such a motion, "a district court must 'determine whether, viewing all the evidence in the light most favorable to the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'" United States v. Grigsby, 111 F.3d 806, 833 (11th Cir. 1997) (quoting United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987)). When a defendant moves for a judgment of acquittal at trial, the Court may "reserve decision on the motion, . . . submit the case to the jury, and decide the motion . . . after [the jury] returns a verdict of guilty or is discharged without having returned a

verdict." Rule 29(b).  However, "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Id.

## II. Discussion

Having carefully reviewed the record, the applicable law, and the parties' arguments, the Court finds that Jackson's motions are due to be denied. Jackson's sole contention is that the Government presented insufficient evidence to prove that he acted willfully. See Motion at 2, 12.  To sustain a conviction for conspiracy to pay or receive health care kickbacks and for the substantive counts of paying and receiving health care kickbacks, the Government had to prove that Jackson acted willfully. See Court's Final Jury Instructions (Doc. 175) at 13–14, 17, 20.  As the Court instructed the jury, "[t]he word 'willfully' means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law." Id. at 23.  In United States v. Starks, the Eleventh Circuit rejected the argument that a defendant must know the specific law or rule that he is violating to be guilty of paying or receiving health care kickbacks.  157 F.3d 833, 837–39 (11th Cir. 1998).  The court explained that "Section 1320a-7b is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct."[3] Id. at

---

[3] Therefore, to the extent Jackson maintains that the Court should look to tax evasion cases for guidance, see Motion at 15, his argument is unavailing.

838. The court further reasoned that "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." Id.

Here, the Government presented sufficient circumstantial evidence in its case-in-chief for a reasonable trier of fact to conclude that Jackson acted willfully. When construed in the light most favorable to the jury's verdict, several of the circumstances surrounding Jackson's interactions with Earl Smalls were suspicious and suggested that Jackson was acting with a bad purpose to disobey or disregard the law. Smalls testified that he first approached Jackson at an auto parts store and asked whether Jackson had TRICARE. See Tr. Vol. 2, at 135–36. Smalls told Jackson that Smalls got a 10% commission for selling compounded creams and that he would pay Jackson $300 for receiving creams. See id. at 136. After Jackson got a prescription from a doctor and received the creams, Smalls paid Jackson outside Jackson's house. See id. at 143, 145. Jackson knew that TRICARE was paying for the creams, and, at some point, he mentioned to Smalls that the creams were "pretty expensive." Id. at 136, 192. The jury could use its common sense in interpreting this evidence. While reputable pharmaceutical companies may run television advertisements or send representatives to meet with doctors, they do not have salespersons solicit business at auto parts stores. Moreover, patients do not

receive cash for getting expensive prescription medications paid for by an insurance company or federal health care program.

The evidence also showed that Jackson participated in Smalls's plan to maximize profits. Smalls told Jackson, "The more creams that you get, the more money I can make." Id. at 144. Smalls told Jackson that Smalls would pay Jackson $100 for every person that Jackson got to sign up for the creams. See id. at 139–40. Smalls instructed Jackson to have people sign up for two or three creams—preferably the most expensive ones—and a six- or twelve-month supply of refills. See id. at 151. Smalls did not provide any information sheets or documentation about the creams. See id. at 153. Instead, Smalls said to tell prospects that the most expensive creams "were the really good creams and they really work. And basically that you can make $300 if you can get . . . two or three of these creams." Id. This focus on maximizing profits regardless of medical need supports an inference of willfulness. See United States v. Ricard, 922 F.3d 639, 648 (5th Cir. 2019) ("The jury could also conclude that Ricard shuffled psychiatric patients among home health agencies, based on a desire for profit rather than their medical needs.").

In addition, Smalls told Jackson to mark the creams and circle the number of refills on the prescription forms. See Tr. Vol. 2, at 153–55. After Jackson recruited patients, he and Smalls would meet in a parking lot where Smalls paid Jackson $100 for each completed form that Jackson had. See id. at

163. Before paying Jackson, Smalls looked over the forms to make sure that they were filled out completely. See id. Thus, even though Jackson did not have medical training or detailed knowledge about the creams, he marked the creams and the number of refills on the prescription forms. The jury could reasonably find this conduct to be evidence of an intent to disobey or disregard the law. See United States v. Grow, 977 F.3d 1310, 1322–23 (11th Cir. 2020) (per curiam) ("[A] reasonable jury could find knowledge of the fraud, and an intent to defraud, from Grow sending prefilled prescriptions and intake forms to the telemedicine companies already checked off with creams and vitamins that had the highest reimbursement rates, with the most refills, and in the largest sizes.").

The evidence about Jackson's method of compensation also supports a finding of willfulness. About 80% of the time, Smalls paid Jackson in cash when they met in a parking lot. Tr. Vol. 2, at 165. Sometimes Smalls paid Jackson with personal checks. Id. at 148, 165–66. The Government submitted copies of two checks. Gov't Ex. 2J (Doc. 172-20). The checks did not contain any notes linking the payments to recruiting patients, compounded creams, or Smalls's employer CasePark. The memo line on one check for $9,000 vaguely said "re-payment," and the memo line on a check for $3,000 was blank. Id. at 1–2. Jackson's acceptance of cash payments in parking lots and checks with vague notations or no notations is further evidence that he knew that he was not in a

legitimate employment or contractor situation where large payments would be tracked. See Starks, 157 F.3d at 839 n.8 ("The government produced ample evidence, including the furtive methods by which Siegel remunerated Starks and Henry, from which the jury could reasonably have inferred that Starks and Siegel knew that they were breaking the law . . . ."); United States v. Howard, 28 F.4th 180, 200 (11th Cir.) ("The memo lines of those checks were telling. One of them stated 'Equipment Sales,' and two stated cryptically 'Donation,' but there was never any explanation for why Howard was 'donating' the money to Stone or what equipment he had sold Howard."), cert. denied sub nom. Bramwell v. United States, 143 S. Ct. 165 (2022).

Notably, from all of the evidence about Jackson's lack of formal employment relationship with Smalls or CasePark, the jury could have inferred that Jackson was acting willfully. Smalls told Jackson that CasePark was hiring. See Tr. Vol. 2, at 167. Although Jackson knew that employees such as Smalls got paid a percentage of the price of the creams, Jackson never became an employee of CasePark. See id. at 136. Moreover, Smalls never asked Jackson to complete any tax forms or other employment paperwork. See id. at 148. Thus, the evidence showed that Jackson was paid primarily in cash, worked only to solicit patients, did not keep an office, and did not sign a sales contract or other employment paperwork despite knowing that he could potentially make more money as an employee. The Fifth Circuit has found that

"evidence that commissions for referring Medicare beneficiaries were paid monthly in cash at the defendant's home, the recruiters worked only in the field soliciting beneficiaries, and the recruiter did not keep an office or sign a sales contract" can support a finding of willfulness. Ricard, 922 F.3d at 649. Jackson argues that "there was no evidence that [he] attempted to conceal any of his behavior." Motion at 15. But the jury could have concluded that Jackson wanted to conceal his relationship with CasePark because he accepted cash payments and personal checks, chose not to become a documented employee of CasePark, and did not confirm that Smalls or CasePark was tracking the payments for tax purposes.

Finally, the evidence supports an inference that Jackson knew about the investigation into CasePark but was willing to continue engaging in the scheme. After Smalls heard that CasePark was being investigated, he told Jackson that the business was probably "going to come to an end because there was talk about freezing the money" and that "[w]e may not be getting any more money." Tr. Vol. 2, at 172–73. In a recorded phone call, Jackson told Joshua Robinson that the company was being "audited" and that he was waiting for funds to be "released." See Gov't Ex. 3B (Doc. 172-23; Gov't Ex. 3B) at 0:45–0:55. Jackson did not convey Smalls's message that the business was probably going to come to an end. Jackson maintains that his knowledge about an "audit" of Smalls's employer does not prove willfulness because many audits of legitimate activities

and businesses occur. See Motion at 14. However, the jury could have inferred that Jackson knew that the investigation was not a run-of-the-mill audit because money was frozen and Smalls thought the business was likely going to end. Despite this knowledge, Jackson was willing to recruit patients and to train Robinson how to do so. See Gov't Ex. 3B, at 1:15–1:55. The jury could have concluded that Jackson's lack of concern about the investigation showed a willful intent. Cf. United States v. Vernon, 723 F.3d 1234, 1268 (11th Cir. 2013) (upholding a finding of willfulness based on evidence that the defendant "(1) knew that Lori Brill was under investigation for federal health care fraud; (2) nevertheless, decided to hire her; and (3) considered refusing to participate in an investigation of Lori Brill's actions").

In sum, the evidence in the Government's case-in-chief showed that Jackson chose to enter into business with Smalls after meeting at an auto parts store, participated in paying patients in cash for getting an expensive product purchased by TRICARE, selected and marked the most expensive medications and refills despite having little knowledge about the creams and no medical training, met Smalls in parking lots instead of an office, accepted cash payments and checks with vague notations, did not become an employee of CasePark even though he potentially could have made more money if he had, and knew of a serious investigation into CasePark but continued the scheme. From this evidence, the jury reasonably could conclude that Jackson was acting

with the bad purpose to disobey or disregard the law. Therefore, the Court finds that Jackson's ore tenus motion for judgment of acquittal made at the end of the Government's case-in-chief during the jury trial is due to be denied.

The Court will deny Jackson's remaining two motions for the same reasons. In addition, Jackson's testimony during the defense case further supports the jury's verdict. The Eleventh Circuit has instructed that "[a] defendant who chooses to testify runs the risk that the jury will disbelieve [his] testimony, and 'runs the risk that if disbelieved the jury might conclude the opposite of [his] testimony is true.'" Grow, 977 F.3d at 1325 (alterations in original) (quoting United States v. Mateos, 623 F.3d 1350, 1362 (11th Cir. 2010)). "This is especially so in cases . . . that turn mainly on subjective elements, like a defendant's intent or knowledge." Id. at 1325–26 (alteration in original) (quoting Mateos, 623 F.3d at 1362). Jackson testified that he did not believe he was entering a criminal conspiracy, that receiving $1,000 in cash did not arouse his suspicion, that he did not try to conceal anything about the creams, and that he believed selling creams was a legitimate business opportunity. See Tr. Vol. 3, at 48–49, 51, 67–68. But "the jury was entitled to conclude that he was lying and infer the opposite was true." Grow, 977 F.3d at 1326.

In his written Motion, Jackson relies principally on the decisions in United States v. Nora, 988 F.3d 823 (5th Cir. 2021), and United States v.

Medina, 485 F.3d 1291 (11th Cir. 2007), in which the courts found that the prosecution had failed to present sufficient evidence to prove that the defendant had acted willfully. See Motion at 10–15. The facts of both cases, however, are distinguishable.

In Nora, a health care company called Abide hired the defendant Nora as a data entry clerk and later promoted him to office manager. See 988 F.3d at 826. Throughout his employment, Nora was salaried. Id. While Nora's work responsibilities helped the company engage in a fraudulent scheme, "the evidence did not prove that Nora understood Abide's various practices and schemes to be fraudulent or unlawful." Id. at 831. The prosecution argued that Nora knew of the unlawful nature of the activity because he received trainings, attended regular staff meetings, and worked in close proximity with many others who knew about the company's fraudulent scheme. See id. at 831–34. But the court noted that there was no evidence that the content of the trainings and meetings would have alerted Nora to the illegal nature of the activity. See id. at 831. Moreover, although many individuals at the company understood the activity to be illegal, no one testified that Nora knew that the company's practice was unlawful or that anything had been said to him about the illegal activity. Id. at 831–32. One of the company's fraudulent practices was "[a]rguably . . . inherently suspicious," but the court concluded that Nora could not be found guilty for "negligently participating in a fraud." Id. at 832. And

the prosecution failed to introduce "evidence showing that Nora directly observed, or deliberately closed his eyes to, fraudulent behavior such that a rational juror could infer that he knew about Abide's fraud." Id. at 834. Similarly, in Medina, the defendant was a secretary who was told to "leave the room whenever [others] discussed the details of the scheme." 485 F.3d at 1302. While the defendant may have known that her employer was paying patient recruiters, no evidence showed that she knew "that the cash is needed to pay illegal kickbacks rather than for paying lawful" associates. Id.

Here, unlike the defendants in Nora and Medina, Jackson was not a salaried employee who was simply doing secretarial or administrative tasks. Instead, Jackson was usually paid in cash based on the number of patients that he recruited and the number of creams they received. He participated in the suspicious practice of marking specific creams and the number of refills on prescription pads before patients ever spoke to a doctor. And he knew about a serious investigation into the marketing company but chose to continue in the business. In addition, he testified, allowing the jury to observe his demeanor and determine whether he was being truthful. The jury concluded that he was not. Therefore, the Court finds the decisions in Nora and Medina to be inapplicable to the facts here.

### III. Conclusion

Viewing all of the evidence in the light most favorable to the jury's verdict, the Court concludes that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt as to each conviction. Because sufficient evidence supported the jury's verdict, Jackson's motions are due to be denied. Accordingly, it is

**ORDERED:**

1. Jackson's <u>ore tenus</u> motion for judgment of acquittal made on May 12, 2023, <u>ore tenus</u> motion for judgment of acquittal made on May 15, 2023, and post-trial Motion for Judgment of Acquittal (Doc. 182) are **DENIED**.

2. Pursuant to the jury's Verdict (Doc. 176), Defendant Mario Correa Jackson is adjudged **GUILTY** of Count Four and Count Five of the Indictment (Doc. 1).

3. The Court will set a sentencing hearing in a separate notice.

**DONE AND ORDERED** in Jacksonville, Florida, on October 4, 2023.

*[Signature]*
**MARCIA MORALES HOWARD**
United States District Judge

lc30
Copies to:
Counsel of Record